UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| CREMILDE C. RAPOSO, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | Civil Action No. 17-cv-10308-ADB |
| NANCY A. BERRYHILL, | * | |
| *Commissioner of Social Security*, | * | |
| | * | |
| Defendant. | * | |

## MEMORANDUM AND ORDER

BURROUGHS, D.J.

Plaintiff Cremilde C. Raposo ("Ms. Raposo" or "Claimant") brings this action pursuant to

section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), challenging the final decision of

the Commissioner of the Social Security Administration (the "Commissioner") denying her

claim for Supplemental Security Income ("SSI") benefits. Currently pending before the Court are

Claimant's motion to reverse or remand the Commissioner's decision denying her SSI benefits

[ECF No. 15], and the Commissioner's cross-motion for an order affirming the decision. [ECF

No. 21]. For the reasons described herein, the Court finds that the decision of the Administrative

Law Judge ("ALJ") was not supported by substantial evidence and therefore <u>VACATES</u> the

decision of the Commissioner and <u>REMANDS</u> the case for further administrative proceedings

consistent with this opinion.

## I.    BACKGROUND

### A.    Statutory and Regulatory Framework: Five-Step Process to Evaluate Disability Claims

"The Social Security Administration is the federal agency charged with administering

both the Social Security disability benefits program, which provides disability insurance for

covered workers, and the Supplemental Security Income program, which provides assistance for

the indigent aged and disabled." Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001) (citing 42

U.S.C. §§ 423, 1381a).

The Social Security Act (the "Act") provides that an individual shall be considered to be

"disabled" if he or she is:

> unable to engage in any substantial gainful activity by reason of any medically
> determinable physical or mental impairment which can be expected to result in
> death or that has lasted or can be expected to last for a continuous period of not less
> than twelve months.

42 U.S.C. § 1382c(a)(3)(A); see also 42 U.S.C. § 423(d)(1)(A). The disability must be severe,

such that the claimant is unable to do his or her previous work or any other substantial gainful

activity that exists in the national economy. See 42 U.S.C. § 1382c(a)(3)(B); 20 C.F.R. §

416.905.

When evaluating a disability claim under the Act, the Commissioner uses a five-step

process, which the First Circuit has explained as follows:

> All five steps are not applied to every applicant, as the determination may be
> concluded at any step along the process. The steps are: 1) if the applicant is engaged
> in substantial gainful work activity, the application is denied; 2) if the applicant
> does not have, or has not had within the relevant time period, a severe impairment
> or combination of impairments, the application is denied; 3) if the impairment
> meets the conditions for one of the "listed" impairments in the Social Security
> regulations, then the application is granted; 4) if the applicant's "residual functional
> capacity" is such that he or she can still perform past relevant work, then the
> application is denied; 5) if the applicant, given his or her residual functional
> capacity, education, work experience, and age, is unable to do any other work, the
> application is granted.

Seavey, 276 F.3d at 5 (citing 20 C.F.R. § 416.920).

## B. Procedural Background

Claimant filed her application for SSI benefits on November 15, 2013. [R. 25].[1] She alleged that she became disabled on July 30, 1992 due to Raynaud's Syndrome ("Raynaud's"),[2] Systematic Lupus Erythematosus ("Lupus"), rheumatoid arthritis, irregular heartbeat, hyperlipidemia, a blood disorder, a muscle disorder, chronic tinnitus, vision problems, and stomach problems. [R. 26, 158].

The Social Security Administration ("SSA") denied Claimant's application for SSI benefits on February 27, 2014, and again upon reconsideration on August 8, 2014. [R. 25]. Thereafter, Claimant timely requested an administrative hearing, and a hearing took place before Administrative Law Judge ("ALJ") Paul W. Goodale on November 2, 2015. [R. 44]. Claimant, who was represented by counsel, appeared and testified at the hearing. [R. 44]. On December 22, 2015, the ALJ issued a decision finding that Claimant was not disabled. [R. 21]. On January 9, 2017, the SSA Appeals Council denied Claimant's Request for Review [R. 2]. On February 24, 2017, Claimant filed a timely complaint with this Court, seeking review of the Commissioner's decision pursuant to section 205(g) of the Act. [ECF No. 1].

## C. Factual Background

Claimant was born in 1966 in Portugal where she lived until the age of 12. [R. 60, 62]. In 1978, she immigrated to the United States and attended school through the ninth grade. [R. 61].

---

[1] References to pages in the Administrative Record, which were filed electronically at ECF No. 12, are cited as "[R. __ ]."

[2] "Raynaud's is a circulatory disease that results in the narrowing of the 'smaller arteries that supply blood to your skin' causing affected areas, such as the fingers and toes, to become 'numb and cold.'" Murphy v. Colvin, No. 15-cv-11548-GAO, 2016 WL 5402184, at *2 (D. Mass. Sept. 27, 2016) (quoting Mayo Clinic, Diseases and Conditions: Raynaud's Disease, http://www.mayoclinic.org/diseases-conditions/raynauds-disease/basics/definition/con-20022916).

Claimant can read and write in Portuguese and English. [R. 29, 62–63]. Between 2000 and 2015, she held two jobs for short periods of time: prior to 2006, Claimant worked as a house cleaner with her sister [R. 71]; in 2012, she worked as a caretaker for a woman with cerebral palsy [R. 69]. She resides in a second floor apartment in Fall River, Massachusetts with her teenaged son and daughter. [R. 60–61, 99].

### D. Medical Evidence

Because Claimant only challenges the ALJ's decision concerning her conditions of Lupus and Raynaud's, the following summary of the record is tailored accordingly. [ECF No. 16 at 3]. On October 24, 2012, Claimant began seeing Anis Rahman, M.D. as her treating rheumatologist. [R. 408]. He described her as a patient with a 15-year history of Lupus who presented with "diffuse arthralgia associated with Raynaud's" and noted that her fingers, toes, and knees were cold and blue. [R. 408−09]. Claimant denied any chest pain or shortness of breath, but stated that Raynaud's caused her some pain. [R. 408]. Dr. Rahman's examination of her joints showed "no synovitis involving any joint" and a normal range of motion. [R. 408]. He concluded that Claimant was "basically doing well" with the exception of Raynaud's and prescribed Nifedipine and advised her to avoid exposure to cold weather, especially in the winter, and to dress warmly whenever she went outside. [R. 409].

On March 11, 2013, Claimant returned for a follow-up visit with Dr. Rahman, stating that her Raynaud's symptoms had improved with the use of Nifedipine. [R. 410]. Although she had pain in her fingers, her symptoms were briefer and less painful. Id. While her fingers and toes remained cold and discolored, her joints continued to show no synovitis and a normal range of motion. Id.

Claimant saw Dr. Rahman twice in May 2013, at which times her fingers were cold and discolored but he found no other problems with her joints. [R. 411−12]. When she visited Dr. Rahman on July 3, 2013, he observed that although she was still experiencing problems from Raynaud's in warm weather, she felt better after using a steroid, and her "intermittent arthralgia" was "not bad." [R. 413]. On August 14, 2013, Dr. Rahman diagnosed Claimant with shingles, but her Raynaud's condition remained the same. [R. 416].

On December 31, 2013, Claimant reported increasing problems with Raynaud's in the cold weather and that she was having difficulty driving. [R. 559]. Her fingers appeared cold and discolored but an examination showed no synovitis. Id. On January 17, 2014, Claimant was reportedly "not bad" except for exacerbated Raynaud's symptoms in the colder weather and occasional arthralgia. [R. 561]. She also appeared unable to tolerate Nifedipine, as she had developed redness in her face and legs from using it. Id. Dr. Rahman characterized her Raynaud's as "severe" due to the combination Raynaud's and Lupus. Id. He prescribed medications to treat both conditions, and advised her to dress warmly with gloves and a hat. [R. 561−62].

On February 26, 2014, state agency consulting physician John Benanti, M.D. completed a disability determination explanation form for Claimant. [R. 158]. With respect to Claimant's physical residual functional capacity ("RFC"), Dr. Benanti opined that Claimant could perform the following tasks with certain limitations: (a) lifting and/or carrying 20 pounds occasionally and 10 pounds frequently; (b) stooping and climbing ramps or stairs frequently; (c) climbing ladders, ropes, or scaffolds occasionally; (d) kneeling, crouching, or crawling occasionally; (e) standing or walking for about six hours in an eight-hour workday; and (f) sitting for about six hours in an eight-hour workday. [R. 163−64]. He also found that she was not limited in her

ability to push, pull, or balance, and that she did not have any manipulative, visual, or communicative limitations. Id. With regard to environmental limitations, Dr. Benanti concluded that Claimant should avoid concentrated exposure to hazards, avoid working with heavy machinery, and avoid all exposure to cold temperatures due to her Raynaud's. [R. 164].

On April 11, 2014, Dr. Rahman found that Claimant continued to show severe, painful Raynaud's symptoms, that she could not tolerate Nifedipine, and that Diltiazem was "not helping much." [R. 563]. He noted that she appeared to be "in no acute distress, well developed, [and] well nourished," and although her fingers and toes were cold and blue, her joints showed no synovitis. Id. Her condition essentially remained the same at follow-up appointments on June 11, October 21, and December 17, 2014. [R. 620, 622, 624].

On July 16, 2014, state agency consulting physician Marie Turner, M.D. completed an RFC assessment and adopted the same conclusions as Dr. Benanti, except that she determined that while Claimant's gross manipulation was not limited, fine manipulation and feeling may be difficult for her in the cold. [R. 177−78]. She also noted that Claimant should avoid all cold environments, including working outdoors or in refrigerated settings. [R. 177].

On February 12, 2015, Claimant reported to Dr. Rahman that her fingers and toes were always cold and discolored, that she could not go outside in the cold weather, and that her fingers turned blue indoors. [R. 626]. On April 17, 2015, Dr. Rahman noticed some improvement in Claimant's condition, likely due to either the warm weather or her use of Sildenafil. [R. 628]. On June 29, 2015, Dr. Rahman found that Claimant still had severe Raynaud's, notwithstanding the warm weather. [R. 630].

On September 9, 2015, certified family nurse practitioner ("FNP-C") Laura Leydon examined Claimant in connection with a request for a medical opinion to support her SSI

application. [R. 646−47, 672]. FNP-C Leydon assessed that Claimant's activities of daily living and social functioning were moderately limited by Lupus and that she was limited to (a) two to four hours of standing at one time; (b) working four hours per day, except that she was unable to work at all in the winter months due to severe Raynaud's; and (c) frequently or ocassionally lifting five pounds. [R. 673]. She also noted Claimant's gross and fine manipulation limitations were "dependent on flares" but did not provide further explanation. [R. 673]. FNP-C Leydon signed the completed medical opinion, which was also co-signed by a second person whose name is illegible, although Claimant asserts that the signature belongs to Christopher A. Sahar, M.D. who Claimant saw on October 25, 2015, when she was unable to schedule an appointment with FNP-C Leydon. [R. 126−28, 673]; [ECF No. 16 at 9].

E.    **Claimant's Hearing Testimony**

On November 2, 2015, Claimant testified at the hearing before the ALJ and explained the severity and causes of her Raynaud's symptoms. She said that she could move her fingers during the hearing but that once the weather became colder, going outside would cause pain and numbness in her hands. [R. 51]. Humidity also turns her fingers blue in warm weather, although not as severely as the cold does. [R. 52]. Claimant stated that she controls the temperature of her hands at all times. Id. For instance, she said that she sets the temperature in her home higher than average, and that she would have to work in a "temperature controlled" environment. [R. 59, 74]. More specifically, she estimated that she is "fine if [the temperature is], like, 73 inside, 75," and then clarified that any temperature in the 70s was sufficient. [R. 74].

Claimant also testified with regard to her physical capabilities and daily activities. Although her fingers felt somewhat numb during the hearing, she said that she could hold a pen or pencil and pick things up. [R. 53]. She also said that she could pick up a tissue box, eat with a

fork and knife, and drink a cup of coffee, if the temperature was warm enough. [R. 74]. With

regard to her daily living activities, Claimant stated that she shops for groceries with her son or

daughter but does not carry the grocery bags. [R. 78]. Around her home, she tries to make the

beds, wash some dishes, and does simple cooking. [R. 79−80].

### F. Vocational Expert Testimony

Vocational expert ("VE") Joseph Leo Goodman also testified at the hearing before the

ALJ. [R. 87]. The ALJ's first hypothetical presumed a person of Claimant's age, education, and

work experience, who could perform work at a light level, subject to the following limitations:

(a) occasionally climbing stairs, stooping, crouching, crawling, or kneeling; (b) never climbing

ladders, ropes, or scaffolds; (c) frequently handling and fingering bilaterally; (d) avoiding

concentrated exposure to cold, which the ALJ defined as less than 60 degrees; (e) avoiding

exposure to wetness and humidity; and (f) avoiding exposure to workplace hazards such as

unprotected heights and dangerous machinery (excluding motor vehicles). [R. 90−91]. The VE

testified that a person described in the hypothetical could perform Claimant's previous job as a

cleaner. [R. 92].

In a second hypothetical, the ALJ adopted the same exertional level and limitations as in

the first hypothetical but added that the person could not perform production rate work. [R.

92−93]. The VE responded that a person described in the second hypothetical could work as a

cleaner. [R. 93]. He also identified jobs in the national or regional economy that such a person

could perform, including mail clerk, polisher, label machine tender, and cashier. [R. 93−94]. The

ALJ then slightly amended the second hypothetical by asking what jobs would be available if the

person's fine manipulation were reduced from frequently to occasionally. [R. 95−96]. The VE

identified cleaner or surveillance system monitor as available jobs. [R. 97]. The ALJ posed a

third hypothetical with the same exertional level and limitations as the second hypothetical, limiting the person to occasional fine manipulation, and adding that the person would need two or more unscheduled breaks for 20 minutes each. [R. 97−98]. The VE responded that no jobs exist in the national or regional economy that satisfy the third hypothetical. [R. 98].

### G. ALJ's Decision

On December 22, 2015, the ALJ issued a decision finding that Claimant was not disabled under section 1614(a)(3)(A) of the Act. [R. 35]. At step one, he found that Claimant had not engaged in substantial gainful activity from the date of the application. [R. 26]. He next concluded that Claimant had the following severe impairments: Lupus, Raynaud's, blood disorder (low white blood cell count), and rheumatoid arthritis of the fingers, toes, and knees, but that these impairments did not meet or equal the severity of one of the listed impairments in 20 C.F.R. §§ 416.920(d), 416.925, and 416.926.[3] Id. At step four, the ALJ determined that Claimant had the RFC to:

> perform light work as defined in [20 C.F.R. § 416.967(b)], except that: she could occasionally stoop, crouch, crawl or kneel, could climb ramps or stairs but could never climb ladders, ropes or scaffolds. [Claimant] could do frequent fingering (fine manipulation) and handling (gross manipulation), all bilaterally. She must avoid concentrated exposure to cold such as temperatures less than 60 degrees, to wetness and humidity, and to workplace hazards such as dangerous machinery (excluding motor vehicles) and unprotected heights. In addition, [Claimant] could not perform production rate or pace work or tandem work with co-employees.

[R. 28]. At step five, the ALJ concluded that Claimant was capable of performing past relevant work as a cleaner, as well as other jobs existing in the national economy such as

---

[3] The ALJ also found that Claimant had the following non-severe impairments, which did not cause more than a minimal or mild limitation on her ability to perform basic work-related activities: arrhythmia, GERD/G.I. problems, vision problems, chronic tinnitus, vertigo, hyperlipidemia, depression, and anxiety. [R. 26−28]. Claimant does not raise any challenge with respect to these non-severe impairments.

mail clerk, polisher, and label machine tender. [R. 34]. Therefore, Claimant was found

not disabled since date of her application for SSI benefits on November 15, 2013. [R. 34].

### H. New Evidence Submitted to Appeals Council

Following the ALJ's decision, Claimant requested review by the Appeals Council and

submitted new evidence that developed after the hearing was conducted before the ALJ. The new

evidence showed that on January 27, 2016, upon a referral from FNP-C Leydon, Claimant saw

orthopedist Brad Green, D.O. regarding pain in her left thumb and wrist. [R. 116]. Dr. Green

diagnosed her with osteoarthritis in the left thumb CMC joint. [R. 117]. On January 28, 2016,

Claimant saw Dr. Sahar complaining of left foot tingling. [R. 126]. Dr. Sahar's notes indicated

that he contacted Dr. Rahman who told him that Claimant "unequivocally has the wors[t] case of

[Raynaud's] that he has seen in his career." [R. 127]. Dr. Sahar also completed an Excuse for

Work/School form for Claimant that stated that her fingers are chronically purple/black due to

lack of circulation, that "[a]ctivity and temperatures can worsen [her condition] to the point that

she risks auto-amputation," and that Dr. Rahman reported that her Raynaud's has been

unresponsive to all medication. Moreover, Dr. Sahar wrote that "[w]hile she may be able to

bend, lift, or use her hands for repetitive activities, none of this is physically safe for her due to

risks of severe health effects," and that in his opinion, "[Claimant] cannot work nor will she be

able to work." [R. 20]. On March 1, 2016, Claimant returned to see Dr. Green for reassessment

of the pain in her left thumb. [R. 118]. A physical examination showed mild swelling and pain in

her left thumb [R. 119]. He noted that she planned to see her rheumatologist that same week and

recommended that she see a hand specialist for ongoing assessment and care concerning her

osteoarthritis and Raynaud's. [R. 119]. Dr. Rahman saw Claimant on March 4, 2016 and

described her Raynaud's as severe. [R. 106].

## II.    STANDARD OF REVIEW

This Court has jurisdiction pursuant to section 205(g) of the Act, 42 U.S.C. § 405(g). Section 205(g) provides that an individual may obtain judicial review of a final decision of the Commissioner of Social Security by instituting a civil action in federal district court. See 42 U.S.C. § 405(g). The district court may take a number of actions with respect to the Commissioner's decision. First, under sentence four of section 205(g), the court has the power "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." Id. A court's decision under sentence four, however, can be based only on a review of the administrative record of proceedings before the Commissioner. See Whitzell v. Astrue, 792 F. Supp. 2d 143, 147 (D. Mass. 2011) (quoting 42 U.S.C. § 405(g)). If a claimant presents new evidence to the court that was not contained within the administrative record, the court may not consider it. "If additional evidence is to be considered, it must be by way of remand[]" pursuant to sentence six of Section 205(g). Hamilton v. Sec'y of Health & Human Servs., 961 F.2d 1495, 1503 (10th Cir. 1992). Sentence six permits the court to remand a case to the Commissioner for further proceedings and order the evidence to be added to the record for consideration. See 42 U.S.C. § 405(g) ("The court may…at any time order additional evidence to be taken before the Commissioner…but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . .").

Under section 205(g), sentence four, this Court's review of the Commissioner's decision is "limited to determining whether the ALJ used the proper legal standards and found facts upon the proper quantum of evidence." Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir.

2000). In conducting such review, the Court must defer to the Commissioner's factual findings, so long as such findings are "supported by substantial evidence," but the court's review of the Commissioner's conclusions of law is de novo. Id.; see also Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) ("The ALJ's findings of fact are conclusive when supported by substantial evidence . . . but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts."). Substantial evidence means "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, (1938)). The Court "must affirm the [Commissioner's] resolution, *even if the record arguably could justify a different conclusion*, so long as it is supported by substantial evidence." Rodriguez Pagan v. Sec. of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987) (emphasis added) (citing Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 128 (1st Cir. 1981)).

III.    DISCUSSION

Claimant contends that the ALJ's decision is not supported by substantial evidence, because he (1) failed to properly weigh the treating source opinions, (2) misconstrued Claimant's hearing testimony in finding her not entirely credible, and (3) limited Claimant's RFC to avoiding temperatures below 60 degrees without any basis in the record for choosing that specific temperature. She also asserts that the Appeals Council erroneously denied her request for review in light of the new and material evidence that she submitted. For the purpose of providing guidance for the proceedings after the remand, the Court addresses each of Claimant's arguments.

### A.    Treating Source Opinions

1.    FNP-C Leydon and Dr. Sahar

FNP-C Leydon examined Claimant on September 9, 2015, and completed and signed a

medical statement in connection with Claimant's disability application. [R. 647, 673]. The

statement was also purportedly cosigned by Dr. Sahar. Claimant argues that the ALJ should have

granted this medical statement the controlling weight of a treating source opinion. Under the

regulations that were effective at the time of Claimant's application, "[o]nly licensed physicians,

licensed or certified psychologists, and other 'acceptable medical sources,' . . . qualify as

'treating sources,' whose opinions generally are entitled to more weight and, under certain

circumstances, can be afforded controlling weight." Barowsky v. Colvin, No. 15-cv-30019-KAR,

2016 WL 634067, at *6 (D. Mass. Feb. 17, 2016) (quoting 20 C.F.R. §§ 404.1502, 404.1513). As

a nurse practitioner, FNP-C Leydon was not an acceptable medical source whose opinion was

entitled to the weight of a treating source opinion. Reyes v. Berryhill, No. 16-cv-10466-DJC,

2017 WL 3186637, at *8 (D. Mass. July 26, 2017); see Campagna v. Berryhill, No. 16-cv-

00521-JDL, 2017 WL 5037463, at *4 (D. Me. Nov. 3, 2017) ("opinion of [nurse practitioner]

was not entitled to controlling weight because a nurse practitioner is not a so-called 'acceptable

medical source'" (citations omitted)); cf. Rescission of Social Security Rulings 96-2p, 96-5p, and

06-3p, 82 Fed. Reg. 15,263 (Mar. 27, 2017) (policy interpretation ruling that nurse practitioners

are not "acceptable medical sources" has been rescinded, but only effective "for claims filed on

or after March 27, 2017" (emphasis added)); 20 C.F.R. § 416.902(a)(7) (nurse practitioner

considered an acceptable medical source for claims filed "on or after March 27, 2017" (emphasis

added)).

Rather than a treating source, FNP-C Leydon was an "other" medical source. <u>Maio v. Astrue</u>, No. 10-cv-235-JL, 2011 WL 2199845, at *4 (D.N.H. June 7, 2011). "An administrative law judge need not provide 'good reasons' for discounting the opinion of a 'non-acceptable' treating source, as he or she must if addressing the opinion of an 'acceptable' treating source." <u>Guest v. Berryhill</u>, No. 16-cv-0028-JHR, 2017 WL 2414468, at *7 (D. Me. June 2, 2017); <u>see</u> <u>Johnson v. Colvin</u>, 204 F. Supp. 3d 396, 410 (D. Mass. 2016) ("The opinions of other medical sources are not entitled to controlling weight and an administrative law judge is not required to provide 'good reasons' for the weight assigned to such opinions."). The ALJ "need only 'explain the weight given to opinions from these 'other sources' or otherwise ensure that the discussion of the evidence . . . allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." <u>Guest</u>, 2017 WL 2414468, at *7 (quoting SSR 06-03p); <u>see</u> <u>Reyes</u>, 2017 WL 3186637, at *8 ("[A]n ALJ should consider opinions of other health care providers, such as nurse practitioners, when evaluating 'key issues such as impairment severity and functional effects, along with the other relevant evidence in the file.'" (quoting SSR 06-03p)).

Claimant asserts that "the fact that [a nurse practitioner] is not an acceptable medical source is not a good reason to discredit or deny their statement appropriate consideration." [ECF No. 23 at 4]. Here, the ALJ did not discredit FNP-C Leydon's opinion, nor did he attribute less weight to her opinion merely because she was not an acceptable medical source. The ALJ explained that he granted limited weight to her evaluation because it was not consistent with the medical evidence of record or Claimant's hearing testimony. [R. 32]. He afforded substantial weight to the RFC assessments completed by the state agency medical consultants, and credited Claimant's testimony that she could use her hands despite her Raynaud's in a temperature-

controlled environment, all of which contradicted FNP-C Leydon's opinion that Claimant could not work at all during the winter. [R. 32]. In sum, the ALJ was not required to give controlling weight to FNP-C Leydon's opinion and properly explained the basis for assigning it limited weight in the context of the full record.

Moreover, the purported signature of Dr. Sahar does not recalibrate the weight owed to the September 9, 2015 medical statement. "It is well-settled that . . . [a] physician's sign-off on a [non-acceptable medical source's] opinion" does not transform that opinion into an acceptable medical source. Allen v. Colvin, No. CA 13-781L, 2015 WL 906000, at *11 (D.R.I. Mar. 3, 2015); see Lobov v. Colvin, No. 12-cv-40168-TSH, 2014 WL 3386567, at *14 n.8 (D. Mass. June 23, 2014) (signature of acceptable medical source on opinion of other source "had no bearing on the ALJ's discretion to assign weight" to other source opinion). The record lacks any evidence that Dr. Sahar had an "ongoing treatment relationship" with Claimant or ever even examined Claimant prior to September 9, 2015. Coppola v. Colvin, No. 12–492, 2014 WL 677138, at *9 (D.N.H. Feb. 21, 2014) (quoting 20 C.F.R. §§ 404.1502, 416.902) (cosigning opinion does not indicate that acceptable medical source "ever examined [claimant]"); Payne v. Astrue, No. 10-cv-1565-JCH, 2011 WL 2471288, at *4–5 (D. Conn. June 21, 2011) (other source opinion cosigned by acceptable medical source was not considered "treating physician opinion" in absence of evidence that acceptable medical source "was ever directly involved in the assessment or treatment of [claimant]"). The record contains numerous references to FNP-C Leydon as Claimant's primary care physician. See [R. 613, 622, 624, 626, 628, 630, 632]. FNP-C Leydon also saw Claimant on the day that the evaluation was completed, whereas the evidence suggests that Claimant first saw Dr. Sahar on October 25, 2015, when Claimant was unable to schedule an appointment with FNP-C Leydon. [R. 126–28]. Accordingly, the ALJ

properly refrained from attributing the September 9, 2015 medical statement to Dr. Sahar and appropriately treated it as the opinion of a non-acceptable medical source. See Allen, 2015 WL 906000, at *11 (no special weight owed absent evidence of a "direct treating relationship" with acceptable medical source and no evidence reflected "that he was the medical provider who saw [claimant]").

        2.    Dr. Rahman

Although the ALJ expressly gave "significant evidentiary weight" to the notes of treating physician Dr. Rahman [R. 33], Claimant argues that the ALJ improperly cherry-picked details from his notes that disfavored a finding of disability. Claimant does not clearly identify which opinion of Dr. Rahman warranted more significant weight, as she only broadly references Dr. Rahman's notes as a whole. "[T]reatment records are not always reliable indicators of a claimant's functional limitations, due to 'the distinction between a doctor's notes for purposes of treatment and that doctor's ultimate opinion on the claimant's ability to work.'" Bourinot v. Colvin, 95 F. Supp. 3d 161, 176 (D. Mass. 2015) (quoting Brownawell v. Comm'r of Soc. Sec., 554 F.3d 352, 356 (3d Cir. 2008)); see also Squeglia v. Berryhill, No. 16-cv-238-JD, 2017 WL 773528, at *5 (D.N.H. Feb. 28, 2017) ("[T]reatment notes that merely repeat a claimant's subjective complaints are not medical opinions.").

Assuming that the notes cited in Claimant's brief may be considered medical opinions, Claimant's argument appears to be that the ALJ inappropriately emphasized certain portions of Dr. Rahman's records and downplayed others. For instance, the ALJ highlighted the findings that Claimant had no synovitis and a full range of motion in her joints, but purportedly glossed over the notations that Claimant's fingers were consistently cold and blue and that her Raynaud's was severe. The ALJ, however, "is not required to—nor could he reasonably—discuss every piece of

evidence in the record." <u>Johnson</u>, 204 F. Supp. 3d at 409; <u>see</u> <u>Ramos–Birola v. Astrue</u>, No. 10-cv-12275-DJC, 2012 WL 4412938, at *20 (D. Mass. Sept. 24, 2012) (ALJ may consider "all the evidence without directly addressing in his written decision every piece of evidence submitted by a party" (quoting <u>NLRB v. Beverly Enterprises-Massachusetts, Inc.</u>, 174 F.3d 13, 26 (1st Cir. 1999))); <u>see also</u> <u>Hicks v. Astrue</u>, No. 09-cv-393-P-S, 2010 WL 2605671, at *4 (D. Me. June 23, 2010), <u>aff'd</u>, 2010 WL 2803648 (D. Me. July 15, 2010) (claimant "characterizes the administrative law judge's choice of medical evidence on which to rely as 'cherry pick[ing],' but that is precisely the role of the administrative law judge").

Here, the ALJ did not merely cherry-pick favorable details. His decision explicitly noted that Dr. Rahman observed that Claimant's fingers were cold and blue and that her Raynaud's medication was not having a substantial impact. [R. 30]. At the hearing, the ALJ also solicited a considerable amount of testimony from Claimant about the discoloration and numbness of her fingers. [R. 51−53, 59, 72−75]. Moreover, the record contains ample evidence that, as the ALJ stated, Claimant did not show signs of synovitis and had a full range of motion in her joints. [R. 408, 410, 412, 413, 418, 559, 561, 563]. Where the ALJ "set out specific findings, supported by the evidence in the case record, his determination must be upheld, even if the evidence could reasonably have justified a different conclusion." <u>Murphy v. Colvin</u>, No. 15-cv-11548-GAO, 2016 WL 5402184, at *14 (D. Mass. Sept. 27, 2016). Accordingly, the ALJ appropriately carried out his "responsibility . . . to resolve evidentiary conflicts and draw factual inferences" and committed no error with respect to his evaluation of the opinions of FNP-C Leydon, Dr. Sahar, or Dr. Rahman. <u>Id.</u>

### B.    Claimant's Credibility

Claimant challenges the ALJ's determination that she was not entirely credible as premised on a misunderstanding of her participation in daily living activities. [R. 32]. The First Circuit has held that an ALJ must consider certain factors in making a determination about a claimant's subjective complaints about pain or other symptoms. Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 29 (1st Cir. 2001). The relevant factors, known as the Avery factors, include: (1) the nature, location, onset, duration, frequency, radiation, and intensity of any pain; (2) precipitating and aggravating factors (e.g., movement, activity, environmental conditions); (3) type, dosage, effectiveness, and adverse side-effects of any medication; (4) treatment other than medication; (5) functional restrictions; and (6) the claimant's daily activities. Id. The ALJ is not required to "expressly discuss every enumerated factor," Balaguer v. Astrue, 880 F. Supp. 2d 258, 268 (D. Mass. 2012), nor is the ALJ required to provide "an explicit written analysis of each factor." Hart v. Colvin, No. 16-cv-10690-ADB, 2017 WL 3594258, at *11 (D. Mass. Aug. 21, 2017) (citing Vega v. Astrue, No. 11-cv-10406-WGY, 2012 WL 5989712, at *8 (D. Mass. Mar. 30, 2012)); see Anderson v. Astrue, 682 F. Supp. 2d 89, 97 (D. Mass. 2010) (ALJ "need not march through every single step in [his or her] reasoning" in reaching a credibility determination). Further, the ALJ may consider Claimant's medical history, her daily activities, and available medical opinions in assessing credibility. Velasquez v. Astrue, No. 10-cv-10765-DPW, 2011 WL 3654433, at *7 (D. Mass. Aug. 18, 2011). "[A]s long as an ALJ's credibility determination is supported by substantial evidence, that decision is entitled to deference." Jones v. Colvin, No. 14-cv-12211-ADB, 2016 WL 1270233, at *8 (D. Mass. Mar. 31, 2016) (citing Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987)).

Claimant first argues that the ALJ's conclusion that she engages in "shopping and house cleaning, sometimes with help from family members" overstated her level of activity, and ignored her testimony about the significant amount of help she receives from family members. The ALJ is entitled to consider the daily living activities that a claimant performs with the help of others. See Teixeira v. Astrue, 755 F. Supp. 2d 340, 347 (D. Mass. 2010) ("That [claimant] claims to have had assistance from her older daughters in completing the household work and that she often takes breaks does not prevent the hearing officer from using the testimony of [claimant's] daily activities as one factor in assessing credibility."). He also is not required to restate each and every potentially relevant statement by Claimant to justify his credibility determination. See Jones, 2016 WL 1270233, at *8 ("Although an ALJ must consider the entire record to assess a claimant's credibility, he is not required to explicitly address every piece of evidence."). Here, the ALJ noted in his decision that Claimant can walk to the local grocery store but that she does not usually carry the shopping bags. [R. 29]. He accurately recounted her testimony that she "tries" to make the beds and wash dishes at home, and that her daughter cooks and does the laundry. Id. That the ALJ later paraphrased these facts or did not exhaustively restate Claimant's testimony as to each daily living activity is an insufficient ground for finding a lack of substantial evidence.

Moreover, the ALJ did not rely solely on her daily living activities to conclude that Claimant was not entirely credible. At the hearing, the ALJ asked questions and heard testimony concerning the nature, location, onset, frequency, and intensity of her symptoms, [R. 51−53, 55−56, 72−74], the precipitating and aggravating factors, [R. 51−53, 59, 72, 75], her daily living activities and how her symptoms limited her functionality. [R. 74, 78−83]. His decision cited the RFC determinations of Dr. Benanti and Dr. Turner that indicated that Claimant could stand

and/or walk for about six hours in an eight-hour workday, occasionally lift and/or carry 20 pounds, and frequently lift and/or carry 10 pounds, and that she must avoid exposure to cold temperatures. [R. 31]. With regard to Raynaud's, he referenced her treating rheumatologist's notes that continually showed no synovitis and a full range of motion in all of her joints, despite the fact that her hands were also consistently cold and blue. [R. 30]. While Claimant testified to the severity of her symptoms, and her inability to use her hands when they turned numb in the humidity or cold, she also said that her hands were fine when she was indoors and the temperature was set in the 70s.

The ALJ's questioning at the hearing, the testimony elicited, and the written decision itself show that the ALJ comprehensively considered the Avery factors in assessing Claimant's credibility. There was also nothing inaccurate or misleading about the ALJ's recitation of Claimant's testimony concerning her daily living activities. Accordingly, the ALJ's credibility determination was supported by substantial evidence.

### C.    RFC Determination

At the hearing before the ALJ, Claimant stated that her hands were fine when she maintained the temperature in her home at 70 degrees or above. When soliciting testimony from the VE, however, the ALJ described a person that must avoid concentrated exposure to cold, which the ALJ defined as temperatures below 60 degrees. Claimant argues that the ALJ had no basis for finding that 60 degrees was the minimum temperature at which she could work.[4] While

---

[4] The Court rejects Claimant's unsupported assertion that the ALJ "tried to distort her testimony" by asking Claimant about the severity of her symptoms if the temperature were set "anywhere in the 70s." [R. 74]. The record does not reflect any attempt by the ALJ to pressure or manipulate Claimant into changing her testimony. After Claimant testified that she that she is "fine if it's like, 73 inside, 75," it was reasonable for the ALJ to attempt to clarify whether her testimony was that 73 or 75 degrees was an approximate or a strict minimum temperature.

substantial evidence may have supported some environmental limitation as to Claimant's ability to work in cold temperatures, the ALJ provided no explanation for defining "cold" as below 60 degrees. The medical evidence showed that her Raynaud's symptoms were notable in warm weather and at their worst in cold weather. See, e.g., [R. 408, 413, 559] (Raynaud's symptoms ongoing in warm weather); [R. 52, 74−75] (Raynaud's symptoms more severe in cold weather). Yet, there is no indication that her treating physicians or the state agency consultants understood "cold" to mean below 60 degrees, and the rest of the medical record is likewise devoid of evidence to support this specific minimum temperature. Accordingly, this environmental limitation is not supported by substantial evidence.

The error might have been harmless considering that Claimant has not shown that a limitation of 70 degrees or above, consistent with her testimony, "would preclude her from any of the jobs discussed by the VE." Mitchell v. Astrue, No. 07-cv-229 ML, 2009 WL 50171, at *12 (D.R.I. Jan. 7, 2009) (ALJ's failure to explicitly consider impact of environmental limitations to light duty, nonproduction jobs was, at most, harmless error). The ALJ also explained to the VE that "another way of" phrasing the limitation was that the hypothetical person could work "indoor jobs, but the indoor jobs would need to be well heated," potentially minimizing the weight that the VE attributed to the 60-degree minimum. [R. 91]. Cf. Laffely v. Barnhart, No. 04–273-P-C, 2005 WL 1923515, *7 (D. Me. Aug. 9, 2005) (harmless error where the ALJ failed to adopt a handling limitation in his RFC determination, but "relied on vocational testimony . . . which did incorporate that restriction").

The VE and the ALJ, however, did not further discuss the range of temperatures at which Claimant could work, and it is unclear from the testimony whether the VE relied on the 60-degree minimum. Notwithstanding the more generalized explanation of the limitation, the ALJ's

decision nonetheless adopted the specific environmental limitation of 60 degrees or above in Claimant's RFC. While the Court does not hold that the ALJ was necessarily required to state a specific temperature range or fully credit the Claimant's testimony as to her preferred temperature setting, remand is ultimately the better course to ensure that there is substantial evidence to support the RFC determination. Claimant has severe Raynaud's and Lupus, and the medical evidence strongly suggests that she should avoid exposure to the cold and that her symptoms, while less severe, persist in warm weather. For these reasons, the environmental limitation on her RFC is likely the critical factor for identifying jobs that she can perform. That the 60-degree minimum in the hypothetical posed to the VE and adopted in the ALJ's decision lacked not only substantial evidence but any evidence at all cannot be discharged as harmless error under the circumstances.[5]

### D.    Appeals Council's Denial

To be comprehensive, the Court addresses Claimant's final argument that the Appeals Council erroneously denied her request for review following her submission of evidence that postdated the ALJ's hearing and/or decision. The new evidence included an "Excuse for Work/School" form completed by Dr. Sahar on January 28, 2016, stating that Claimant is unable to work due to Raynaud's and Lupus and that physical activity and cold temperature may put her at risk of "auto-amputation." [R. 101]. Dr. Sahar's statement further noted that Dr. Rahman described Claimant's condition as the "worst [Raynaud's] he has seen in his career." [R. 101]. Claimant also submitted the notes of Dr. Green, an orthopedist who recommended that Claimant see a hand specialist. [R.119]. She claims that Dr. Green's referral to a specialist indicates that

---

[5] The Court does not reach Claimant's argument that the ALJ should have consulted a medical examiner, as the ALJ will have the opportunity to evaluate Claimant's environmental limitations again on remand.

her condition was not under "control." [ECF No. 16 at 18]. In notifying Claimant of the denial of her request, the Appeals Council stated that it reviewed the new evidence but concluded that it did not have a reasonable probability of changing the ALJ's decision. [R. 2].

"[A]n Appeals Council refusal to review the ALJ may be reviewable where [the Council] gives an egregiously mistaken ground for this action." Roberson v. Colvin, No. 13-cv-265-JD, 2014 WL 243244, at *3 (D.N.H. Jan. 22, 2014) (quoting Mills v. Apfel, 244 F.3d 1, 5 (1st Cir. 2001)). "This standard for review has been described as 'exceedingly narrow,'" Moore v. Astrue, No. 11-cv-11936-DJC, 2013 WL 812486, at *14 (D. Mass. Mar. 2, 2013) (quoting Harrison v. Barnhart, No. 06-3005-KPN, 2006 WL 3898287, at *2 (D. Mass. Dec. 22, 2006)), as such a decision by the Appeals Council warrants "great deference." Mills, 244 F.3d at 6. Where, as here, the Appeals Council reviewed new evidence but determined that it did not establish probable grounds for changing the ALJ's ruling, the Appeals Council "is not egregiously mistaken as long as record evidence supports the decision." Roberson, 2014 WL 243244, at *4; see Shea v. Colvin, No. 12-cv-12420-JLT, 2013 WL 5952992, at *10–11 (D. Mass. Nov. 3, 2013) (no egregious error where the "record before the ALJ spoke to" the issues addressed by post-decision evidence); Moore, 2013 WL 812486, at *15 (no egregious error where "post-ALJ decision medical records would not warrant a different result and the ALJ's decision was supported by substantial evidence"); Robbins v. Astrue, No. 09-cv-343-JD, 2010 WL 3168306, at *3–4 (D.N.H. Aug. 9, 2010) (Appeals Council's decision that new evidence "would not provide a basis to change the ALJ's decision" was not egregious "in the context of all of the evidence").

Claimant relies primarily on Dr. Sahar's statements in the Excuse for Work/School form that described her symptoms, concluded that she was disabled, and shared Dr. Rahman's view

that her Raynaud's was the worst he had seen. The ALJ, however, would not be required to

accept Dr. Sahar's statements regarding the ultimate issue of whether Claimant was disabled,

which were legal conclusions "reserved to the Commissioner." See Anderson v. Colvin, No. 15-

cv-10480-IT, 2016 WL 2605093, at *7 (D. Mass. Mar. 9, 2016), adopting report and

recommendation, 2016 WL 2596013 (D. Mass. May 5, 2016) (quoting Saenz v. Colvin, 61 F.

Supp. 3d 195, 206 (D. Mass. 2014)); Philbrook v. Colvin, No. 14-cv-10766-LTS, 2015 WL

2376129, at *3 (D. Mass. May 19, 2015) ("No special weight attaches to opinions concerning the

dispositive legal question of the claimant's ability to work." (Carr v. Astrue, No. 09-cv-10502-

NG, 2010 WL 3985189, at *8 (D. Mass. Sept. 30, 2010))). The Appeals Council's decision not

to credit Dr. Sahar's opinion in this regard therefore "does not constitute egregious error." Id.

The remainder of the information provided by Dr. Sahar and Dr. Green was "essentially

cumulative" of the evidence that was already before the ALJ and therefore insufficient to

establish an egregious error. Saenz, 61 F. Supp. 3d at 205; see Anderson, 2016 WL 2605093, at

*6 ("Because the Progress Notes are cumulative of evidence that was already in the record

before the ALJ, [claimant] cannot show that the Appeals Council erred when it concluded those

records would not have changed the outcome of the ALJ's decision."). To the extent that Dr.

Sahar referred to the statements of Dr. Rahman, a far more complete record of Dr. Rahman's

observations was presented to the ALJ and factored into his decision. See Philbrook, 2015 WL

2376129, at *3 (no egregious error where new materials "largely summarized information that

was already before the ALJ and considered by him"). The record before the ALJ also addressed

the severity of Claimant's Raynaud's and the effects of activity and temperature on her

condition. See [R. 408, 413, 579, 626, 628, 630] (Raynaud's symptoms in warm weather); [R.

52, 408, 561, 563, 620, 622, 624, 626, 630] (severity of Raynaud's symptoms). The ALJ also

reviewed the medical statement of Claimant's primary care physician, RNP-C Leydon, which was co-signed by Dr. Sahar, and was executed by RNP-C Leydon only a few months before Dr. Sahar completed the Excuse for Work/School form. Finally, although Claimant argues that Dr. Green's referral to a hand specialist for continued care contradicts the evidence that her Raynaud's syndrome was under control, neither the record evidence nor the ALJ suggested that her Raynaud's was under control. Dr. Green's referral to a hand specialist for further assessment and care was again cumulative of the evidence before the ALJ concerning the efficacy of her treatment and medication. See [R. 561, 563, 626, 630, 632]. For these reasons, Claimant fails to show that the Appeals Council committed an egregious mistake.

## IV.     CONCLUSION

For the reasons stated herein, the Court finds that the ALJ's decision was not supported by substantial evidence and therefore DENIES the Commissioner's motion to affirm [ECF No. 21] and GRANTS the Claimant's motion to reverse or remand [ECF No. 15]. The decision of the ALJ is VACATED, and the case is REMANDED for further administrative proceedings consistent with this opinion.

**SO ORDERED.**

March 28, 2018                                             /s/ Allison D. Burroughs
                                                          ALLISON D. BURROUGHS
                                                          U.S. DISTRICT JUDGE